NOT DESIGNATED FOR PUBLICATION

No. 114,120

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALBERTO GRADO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed March 10, 2017. Convictions affirmed, sentences vacated, and case remanded with directions.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., BUSER and LEBEN, JJ.

BUSER, J.: A jury convicted Alberto Grado of possession of methamphetamine with the intent to distribute and possession of paraphernalia to distribute or manufacture. At sentencing, the district court granted Grado's request for a downward durational departure and sentenced him to serve a controlling prison term of 98 months.

On appeal, Grado contends (1) the district court erred when it denied his motion to suppress; (2) the prosecutor committed reversible error during closing arguments; and (3) the district court erred when it declined to impose a downward dispositional or a greater

1

durational sentencing departure. Upon our review, we affirm Grado's convictions but vacate his sentences and remand with directions for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

On May 9, 2014, Officers Husam Shourbaji and Daniel Walker of the Wichita Police Department were dispatched to the Wesley Inn to investigate a "suspicious character" call from hotel employees who suspected possible prostitution activity. Upon the officers' arrival, hotel employees informed Officer Walker that they believed the illicit activities were occurring in room 413, which was registered to Grado.

The two officers went to room 413 and knocked on the door. Grado's uncle, Carlos Rodriquez, opened the door and allowed the officers to enter the room. The officers discovered two other men inside the room, one of whom was Grado, and they observed several used and unused condoms in the room. Officer Walker conversed with Grado about the alleged prostitution activity. According to the officer, although Grado initially denied involvement in prostitution, he later admitted that "he did have some girls up to the room."

During questioning, Grado informed Officer Walker that he was from Colorado and had driven to Wichita in his own vehicle to visit a friend. When Officer Walker asked Grado for some information about his friend, Grado responded that he was actually visiting his cousin, although he did not know the relative's name or other information. Grado was also "fairly vague" about the length of time he planned to stay in Wichita.

Due to Grado's suspicious responses, Officer Walker continued questioning him about his movements in Wichita and his plans on leaving the city. Grado's responses did not alleviate Officer Walker's suspicions, and because the officer noted there "really

2

wasn't much of anything in the room to sustain three grown men in a hotel room for any . . . period of time," the officer suspected that Grado was transporting illegal drugs.

Grado told Officer Walker that he and his companions were not transporting drugs and he offered to allow the officer to search his vehicle. According to Officer Walker, as he and Grado prepared to go down to the parking lot, Officer Shourbaji proposed searching the hotel room as well. Officer Walker could not recall Grado's response, but he thought Grado "kind of said an okay."

Officer Walker and Grado walked to the parking lot where the following discussion relating to the proposed searches ensued:

> "I had asked him, since he had offered, if he was willing to allow us to search his vehicle, and I also included while we were at it if we could search the room. We went to my patrol vehicle and I obtained a Wichita Police Department form, which is the Voluntary Waiver to Search form. I explained to him that that form is a voluntary waiver to search. If he did not want to sign it and give us permission to search his vehicle and/or room, then we would have to apply for a search warrant. I then read him the waiver word for word, inserting in the open blanks his name and the Wichita Police Department, and then asked him if he would be willing to sign it."

Grado agreed to sign the search waiver form for the room and his vehicle, but according to Officer Walker, both before and after he signed the form, Grado asked "what would happen if . . . any drugs [were] found in the room or anywhere." Officer Walker testified that he responded:

> "I told him it would depend on what the drugs were and the amount. I also explained to him that . . . depending on what it was, it could be something as simple as a ticket, but we wouldn't know until or unless he divulged what that was, as far as what it was, the amount, that kind of conversation."

3

Officer Walker searched Grado's vehicle, which had Illinois license plates, and found nothing of interest.

Officer Shourbaji searched the hotel room and found several items of contraband. According to the officer, the hotel room only had a few pieces of furniture—two queen-sized beds, a television on a stand, and a table and chair. Officer Shourbaji noticed that an open pink plastic container was on the table, and when he looked inside, he saw a "crystallized residue" which he recognized as methamphetamine. A piece of paper next to the container had weight measurements written on it. Officer Shourbaji also found an open box of sandwich baggies and a digital scale inside one the drawers of the television stand. Finally, the officer found a McDonald's bag on top of the television stand, and when he opened it, he discovered six individually packaged baggies of "a white chunky substance," later identified as methamphetamine. Individually, the baggies weighed 27.96 grams, 27.78 grams, 27.83 grams, 28.05 grams, 27.98 grams, and 15.33 grams. Collectively, the baggies had a weight of 154.93 grams or about 5 1/2 ounces.

Grado was arrested and Detective Rusty Fasig, a 23-year veteran of the Wichita Police Department, was assigned to investigate the case. After Grado waived his *Miranda* rights, Detective Fasig interviewed him. During the interview, Grado stated that he purchased 5 1/2 ounces of methamphetamine for $5,000 from a "black male wearing a hoody" at the McDonald's near the Wesley Inn on May 8, 2014. Grado did not provide the seller's name but generally described him. Grado said the seller packaged the methamphetamine in six separate baggies, and Grado placed them in the McDonald's bag. Grado also told the detective that scales found in the hotel room were "to weigh out what he had purchased or bought." But Grado claimed that he purchased the drugs for personal use and he had already "snorted about one gram."

Of note, at trial Detective Fasig opined that because methamphetamine users typically purchase "anywhere from a quarter gram to one gram," the amount of drugs

4

found in Grado's hotel room was consistent with a distribution or sales operation. The detective also testified that, in his experience, 5 1/2 ounces of methamphetamine is worth about $5,000.

Although Grado maintained the other two men in the hotel room had "nothing to do with the methamphetamine," a fingerprint identified to Rodriquez was found on one of the baggies. Additionally, Officer Shourbaji testified that when Grado was talking to Officer Walker about what occurred the night before his arrest, one of the other occupants of the room became upset with Grado and angrily said something to him in Spanish.

The State charged Grado with possession of methamphetamine with the intent to distribute, a severity level 1 drug offense, in violation of K.S.A. 2016 Supp. 21-5705(a)(1), and possession of paraphernalia to distribute or manufacture, a severity level 5 drug offense, in violation of K.S.A. 2016 Supp. 21-5709(b)(1).

At trial, Grado testified on his own behalf. He said that he was living in Chicago with his mother on May 9, 2014. Prior to that date, he went to Colorado where he was "buzzing and partying," which meant he drank beer and snorted some cocaine. According to Grado, he met a "younger guy," and at some point, Rodriguez suggested that they travel to Kansas. Grado explained, "[Rodriguez] told me . . . that he has another friend that we can go party and . . . chill with too. So . . . he drove [my car] . . . and we ended up at a hotel."

According to Grado, when the officers arrived at room 413, he was almost asleep. Grado conceded that he initially denied having prostitutes over to the room, and that he later admitted that he had invited some girls listed on a website to the room to "party and hang [out] with [them]." Grado also claimed that because he did not have any drugs or weapons, he allowed the officers to search his vehicle.

5

Grado testified that he went downstairs to the parking lot because one of the officers wanted him to sign a search waiver form. Once Grado was downstairs, the officer asked if the police could also search his hotel room. According to Grado, he responded, "all right" and then signed the form. During the vehicle search, Grado and the officer had the following conversation:

> "He asked me—when he was searching the car he asked me if I had any drugs in the car and I am, like, no, I don't. And he checked under the hood, like, to see if I was trying to get anything by him. And then as we were walking back upstairs—after they asked us questions—I remembered that my uncle had give [*sic*] me some meth. He had given me about—I am not sure how much, but I think it was about a gram and I snorted it when I was high and drunk that night. And I asked him, what if there is drugs? I didn't know how much he had on him, but I know he has some. I think he has some because I know he gave me some. So I am, like, what if there is drugs in there? And he said, well, I don't know. It all depends on how much there is and you can probably get a ticket or something like that. So I am, like, that is all right, I might get a ticket. All right. Cool. So in my head I am just thinking I am just going to get a ticket. I have never been in jail, so that is why I was, like, all right, cool."

When Grado returned to the hotel room, he was arrested. Although Grado acknowledged at trial that he told Detective Fasig he purchased the methamphetamine, he testified that, in fact, he did not know the baggies of methamphetamine, the scales, the white crystal residue inside the open pink case, or other incriminating items were located in the room. Grado claimed that he had never seen the items before nor had he witnessed Rodriguez buying or selling any quantity of drugs. Grado also maintained that he only saw the small quantity of methamphetamine that Rodriguez gave him; he did not see "a whole bunch of baggies." He testified, "The box of baggies, I don't really remember. To tell you, I was pretty high and buzzing the whole time, man. I don't really remember." But when asked how the scales came to be located in the room, Grado testified that Rodriguez brought the scales with him to Kansas.

6

Grado had difficulty detailing the events which occurred while he was staying at the Wesley Inn, but his responses suggested that it would have been very unlikely for Rodriguez to purchase and package the drugs and paraphernalia without Grado being present.

Grado also testified that although he did not know about the drugs found in room 413, at the time of his arrest, Rodriguez "gave [him] basically the who, when, where, how, and how much of this drug deal." Grado explained, "You know, I didn't know how much was there or how much he had, and I told him I never been [*sic*] in jail. [The other officer] said I'm going to get a ticket and that is when me and my uncle were talking in Spanish." According to Grado, because "[he] was scared [of his uncle] and [he] didn't think [he] was going to get into trouble," Grado utilized the information he learned from Rodriguez to lie to Detective Fasig. Grado also claimed that he told Detective Fasig that he paid $5,000 for the methamphetamine because "[he] know[s] people that smoke meth and [he] just pretty much guess[ed] . . . $1,000 an ounce." During cross-examination, however, Grado acknowledged that he paid for the trip to Wichita with the proceeds of a $32,000 cash payment he received to settle a personal injury case, and he never saw Rodriguez with any money. In fact, Grado said he loaned Rodriguez $2,000 sometime before his visit to Colorado.

The jury convicted Grado as charged. Prior to sentencing, he moved for a downward durational or dispositional departure sentence. At sentencing on March 26, 2015, the district court granted Grado's request for a downward durational departure and sentenced him as a severity level 2 drug offender rather than a level 1 drug offender. He was ordered to serve a controlling prison term of 98 months.

Grado timely appealed.

Prior to trial, Grado filed a motion to suppress "all of the evidence and statements gained against [him] as a result of an illegal search of [his] [h]otel room, and subsequent interrogation of [him]." For purposes of this appeal, Grado alleged that his consent to search the hotel room was invalid because it was not voluntarily, intelligently, and knowingly given due to Officer Walker's misleading statements regarding "the possible consequences of drugs being found in the room." The State, on the other hand, contended that Officer Walker's response to Grado's question was not misleading and did not affect the voluntariness of his consent to search because it was a correct statement of the law.

The district court held a hearing on Grado's motion and Officers Walker and Shourbaji testified. According to Officer Walker, after Grado "offered to take [him] to [his] car to let [him] search [it]," he and Grado went out to the parking lot. While at the car, Officer Walker asked Grado to sign a search waiver form because he knew that voluntary, verbal waivers were more likely to be "thrown out" when challenged in court.

While at the parking lot, Officer Walker made the following statements to Grado regarding the waiver form:

> "I explained to him that prior to searching the car or the room, we would have him sign a waiver to search. And I explained to him that this was a voluntary waiver, and he did not have to sign it if he didn't want to. And if he didn't want to sign it, then in order for us to search, we would have to apply for a search warrant."

According to Officer Walker, Grado subsequently asked him "a question about . . . what [the officers] would do if there were any drugs in the room or car." In response, Officer Walker "explained to [Grado] that it would depend on what drug it was and the amount of it" and he "volunteered at that point that it could be something as simple as a

8

ticket, for example." When the prosecutor asked Officer Walker to explain what he meant, the officer replied:

> "By that answer, in the City of Wichita if you're caught with a small amount of marijuana, a lot of times we don't arrest an individual and put them into jail for that. We will issue what's called an NTA, a notice to appear, and release them at that time, with a court date.
>
> . . . .
>
> ". . . The only drug we issue tickets for[, however,] is marijuana; and of course, any drug paraphernalia without the actual drug with it."

Officer Walker acknowledged that while he told Grado the penalty could be as simple as a ticket, he did not mention that it could also be as serious as an arrest and stint in jail nor did he describe the specific penalties associated with other drugs.

Grado signed the form to allow a search of both his vehicle and room 413. Officer Walker maintained that he did not threaten Grado or promise him anything in order to obtain his signature. At the time, no other officers were present, Grado was not under arrest or restrained, and Officer Walker's handgun was not displayed. According to Officer Walker, Grado was free to leave.

At the conclusion of the testimony, the district court denied Grado's motion to suppress, finding that, under the totality of the circumstances, his consent to search was freely and voluntarily given without duress or coercion.

On appeal, Grado contends the district court erred because despite the court's finding to the contrary, Officer Walker's response to Grado's question regarding the possible consequences of finding drugs in his vehicle or hotel room, although "not technically inaccurate, was misleading and deceptive, and was designed to convince [him] to sign the consent form."

9

We evaluate a district court's decision on a motion to suppress under a bifurcated standard, *i.e.*, we review the district court's factual findings to determine whether they are supported by substantial competent evidence and the court's ultimate legal conclusions are reviewed de novo. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014). In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). When the material facts to a district court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which we exercise unlimited review. *State v. Stevenson*, 299 Kan. 53, 57, 321 P.3d 754 (2014).

Unreasonable searches and seizures are prohibited by the Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and § 15 of the Kansas Constitution Bill of Rights. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004). The exclusionary rule operates to protect Fourth Amendment rights through deterrence by preventing the use of unconstitutionally obtained evidence against the subject of the illegal search/seizure. *State v. Daniel*, 291 Kan. 490, 496, 242 P.3d 1186 (2010). Any warrantless search is per se unreasonable unless it falls within one of the exceptions to the warrant requirement. 291 Kan. at 496. The State must prove the lawfulness of the search and seizure, including the scope and voluntariness of any consent search. See K.S.A. 22-3216(2); *State v. Estrada-Vital*, 302 Kan. 549, 556, 356 P.3d 1058 (2015); *State v. Kerestessy*, 44 Kan. App. 2d 127, 132, 233 P.3d 305 (2010).

Did Grado validly consent to a search of room 413? "A valid consent requires two things:  (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the absence of duress or coercion, express or implied. [Citation omitted.]" *State v. James*, 301 Kan. 898, 909, 349 P.3d 457 (2015). "Consent is voluntary if it is the product of free and independent will." *State v. Thompson*, 37 Kan. App. 2d 589, 593, 155 P.3d 724 (2007).

10

"'"Consent" that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.' [*Florida v.*] *Bostick,* 501 U.S. [429,] 43[8, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)].

"'[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. . . .

"' . . . In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.' *Schneckloth* [*v. Bustamonte*], 412 U.S. [218,] 228-29[, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)]." *State v. Spagnola*, 295 Kan. 1098, 1107-08, 289 P.3d 68 (2012).

Whether a consent to search was freely and voluntarily given presents a factual question which is dependent upon the totality of the circumstances, including the individual's mental state. See *State v. Richard*, 300 Kan. 715, 729, 333 P.3d 179 (2014); *Spagnola*, 295 Kan. at 1107 (citing *United States v. Drayton*, 536 U.S. 194, 207, 122 S. Ct. 2105, 153 L. Ed. 2d 242 [2002]; *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 [1996]). Our Supreme Court has identified a nonexclusive and nonexhaustive list of objective factors to aid courts in determining the voluntariness of a consent. *State v. Thompson*, 284 Kan. 763, 811-13, 166 P.3d 1015 (2007) (citing *United States v. Hill*, 199 F.3d 1143, 1148-50 [10th Cir. 1999]; *United States v. Anderson*, 114 F.3d 1059, 1064 [10th Cir. 1997]).

These factors, which are similar to those used to determine whether a police-citizen encounter was consensual, include (1) the threatening presence of several officers, (2) an officer's display of his or her weapon, (3) some physical touching of the person, (4) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, (5) the prolonged retention of an individual's personal

effects, (6) a request to accompany the officer somewhere, (7) interaction in a nonpublic place, (8) absence of other members of the public, or (9) the display of emergency lights. *Thompson*, 284 Kan. at 811. None of these factors, however, are "'legally determinative, dispositive, or paramount.'" *Reiss*, 299 Kan. at 299.

While Grado does not "suggest a rule that would require officers to counsel individuals on the potential consequences of every search before obtaining consent," he argues that his consent was not voluntary, knowing, or intelligent because Officer Walker provided a deceptive and misleading answer about the severity of the consequences he might face if drugs were discovered during the police search. Grado explains: "[Officer] Walker suspected [him] of trafficking drugs[.] . . . Thus, when he told Mr. Grado that he might only get a ticket if he found drugs, [Officer] Walker purposely misled Mr. Grado . . . in order to obtain Grado's consent to search." The State counters that Officer Walker's comments cannot be labeled deceptive due to their accuracy.

A law enforcement officer's resort to deceit, trickery, or misrepresentation may vitiate the voluntariness of a consent to search. *People v. Cardenas*, 237 Ill. App. 3d 584, 588, 604 N.E.2d 953 (1992). See 4 LaFave, Search & Seizure: A Treatise on the Fourth Amendment §§ 8.2(m), 8.2(n), pp. 166, 176 (5th ed. 2015). An officer's use of such tactics standing alone, however, will not invalidate an otherwise voluntary consent. Rather, it is but one factor to be considered in assessing the totality of the circumstances. See *People v. Zamora*, 940 P.2d 939, 942 (Colo. App. 1996); *Miami-Dade Police Department v. Martinez*, 838 So. 2d 672, 674-75 (Fla. App. Dist. 2003).

Caselaw from other jurisdictions indicates that informal promises of leniency or immunity and comments which subtly create a belief that there will be limited or no consequences if the defendant consents to a search may impact the voluntariness of a consent and, thus, such comments may be considered among the totality of the circumstances. See, *e.g.*, *State v. Lowe*, 812 N.W.2d 554, 574-75 (Iowa 2012) (although

officers told defendant that they were not interested in charging her, a subtle form of deception, an officer's use of deception to gain consent to search is but one factor in the analysis and the circumstances indicated that defendant's consent was otherwise voluntary); *State v. Reinier*, 628 N.W.2d 460, 469 (Iowa 2001) (defendant's consent to search was involuntary because the officers used a subtle form of deception with no reasonable basis, *i.e.*, they told defendant that they were looking for "'meth labs'" and "'major dealers,'" which tended to minimize the seriousness of possessing drugs for personal use or casual sales and created a false belief that no adverse consequences would result if a small quantity of drugs was found).

In evaluating Officer Walker's response to Grado's question under the totality of the circumstances, we are persuaded that Officer Walker did not promise Grado anything nor did his response subtly create a belief on Grado's part that there would be minimal consequences upon his consent to a search. Instead, Officer Walker accurately advised Grado that while the consequences of finding drugs during the searches *could be* as simple as a ticket, the penalty *would depend upon the amount and type of drugs found*. This was a truthful statement. Moreover, Officer Walker did not suggest that the possession of 5 1/2 ounces of methamphetamine and drug paraphernalia would result in a ticket rather than the filing of formal criminal charges. Consequently, it is unreasonable to presume that Grado somehow construed this statement as an assurance of leniency or a minimization of the seriousness of possessing a large quantity of methamphetamine for distribution.

Nevertheless, even if Officer Walker's answer is considered incomplete because it did not fully encompass the potentially severe penalties associated with the possession and distribution of methamphetamine, the record fully supports the district court's conclusion that, under the totality of the circumstances, Grado's consent was voluntarily given because it was the product of his free and independent will.

13

Indeed, the following factors all demonstrate that Grado's consent was knowing, intelligent, and voluntary: (1) Grado offered to allow the officers to search his car after learning that Officer Walker suspected that he was involved in illegal drug trafficking; (2) the discussion regarding the search waiver form occurred in a public place, Officer Walker was the only police officer present, and he did not have his gun drawn; (3) Grado was not under arrest or restrained when he verbally consented to the searches or when he signed the form; and (4) the evidence does not suggest that Officer Walker's omission as to the more serious consequences of drug possession or distribution resulted in Grado's misunderstanding regarding the consequences of signing the form.

In summary, we find the district court did not err when it denied Grado's motion to suppress because Officer Walker's response to Grado's question regarding the consequences of finding drugs was not misleading or deceptive. Moreover, considering Officer Walker's response as one aspect of the totality of circumstances, we are convinced that substantial competent evidence supports the district court's determination that Grado's consent was voluntary.

PROSECUTORIAL ERROR

Next, Grado contends the prosecutor committed reversible error during closing arguments by misstating the law and commenting on facts not in evidence. Appellate review of an allegation of prosecutorial error was modified in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). Under the modified standard, we use a two-step process to evaluate claims of prosecutorial error:

"Under the first step, we will continue to analyze whether the prosecutor's statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' 305 Kan. 88, Syl. ¶ 7. At the second stage of the analysis, . . . the prejudice analysis will focus on whether the error prejudiced the defendant's due process rights to a

14

fair trial; if a due process violation occurs, prejudice will be assessed by applying the *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)] constitutional error standard. 305 Kan. 88, Syl. ¶ 8." *State v. Kleypas*, 305 Kan. 224, 316, 382 P.3d 373 (2016).

*Misstating the Law*

Grado argues that the prosecutor misstated the law regarding what was required to convict him of possession of methamphetamine with intent to distribute and possession of paraphernalia to distribute or manufacture when the prosecutor argued that the "jury could believe [the] story [Grado provided at trial] and nonetheless convict."

At the outset, a summary of the relevant law regarding this issue is necessary.

"Because it is the duty of the prosecutor in a criminal matter to see that the State's case is properly presented with earnestness and vigor and to use every legitimate means to bring about a just conviction, prosecutors are given wide latitude in arguing the cases before them. [Citation omitted.]" *State v. Buberwa*, No. 112,771, 2016 WL 757574, at *10 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* March 28, 2016.

Nevertheless, a prosecutor's closing arguments must "accurately reflect the evidence, accurately state the law, and cannot be 'intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.' [Citation omitted.]" *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 (2012). Deliberate misstatements of controlling law fall outside the considerable latitude given to prosecutors during their arguments. *State v. Ramirez*, 50 Kan. App. 2d 922, 942, 334 P.3d 324 (2014), *rev. denied* 304 Kan. 1021 (2016). "A prosecutor 'cross[es] the line by misstating the law.' [Citation omitted.] And a 'defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the

15

jury could have been confused or misled by the statement.' [Citation omitted.]" *State v. Carter*, 305 Kan. 139, 151, 380 P.3d 189, 200 (2016).

To sustain a conviction for both of the crimes charged in this case, the State needed to prove beyond a reasonable doubt the element of possession. See K.S.A. 2016 Supp. 21-5705(a)(1); K.S.A. 2016 Supp. 21-5709(b)(1). Our legislature has defined "'[p]ossession'" as "having joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control." K.S.A. 2016 Supp. 21-5701(q). Accordingly, to prove possession, the State needed to demonstrate that Grado "either: (1) exercised joint or exclusive control over the [methamphetamine and paraphernalia] with knowledge of and intent to have such control, or (2) knowingly kept [these] item[s] in a place where he . . . ha[d] some measure of access and right of control." *State v. Allen*, 52 Kan. App. 2d 729, Syl. ¶ 1, 372 P.3d 432 (2016), *petition for rev. filed* June 6, 2016. An individual "acts 'knowingly,' or 'with knowledge' with respect to . . . circumstances surrounding such person's conduct when such person is aware . . . that the circumstances exist." K.S.A. 2016 Supp. 21-5202(i).

"[W]hen a defendant is in *nonexclusive* possession of the premises on which illegal drugs are found, the mere presence of or access to the drugs, standing alone, is insufficient to demonstrate possession absent other incriminating circumstances. [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 434, 371 P.3d 915 (2016); see also *State v. Beaver*, 41 Kan. App. 2d 124, 129, 200 P.3d 490 (2009) ("[M]ore than 'mere presence or access to the drugs' is required to sustain a conviction."). In that situation, "[t]he State must prove 'other incriminating circumstances linking the defendant to the drugs.'" *Beaver*, 41 Kan. App. 2d at 129.

The State, however, is entitled to prove knowledge and intent by circumstantial evidence, and the following factors may support an inference of possession: (1) the

16

defendant's incriminating statements or suspicious behavior, (2) the defendant's previous participation in the sale of drugs or use of narcotics, (3) the defendant's proximity to the area where drugs are found, and (4) finding the drugs in plain view. *Rosa*, 304 Kan. at 434-35. "'[W]hile no one of these circumstances, by itself, may be sufficient to support a conviction, taken together they provide a sufficient inference of knowing possession to support a verdict.' [Citation omitted.]" 304 Kan. at 434.

Grado acknowledges that the "false confession that his uncle pressured him to make" sufficiently established his guilt for possession of methamphetamine with intent to distribute and possession of paraphernalia to distribute or manufacture. Grado insists, however, that the State misstated the law on the possession element of the charged crimes because if the jury believed his defense at trial—his uncle owned the drugs and paraphernalia and he did not know how much methamphetamine was in the hotel room—the State's evidence was not sufficient to prove, with respect to the paraphernalia and the entire amount of methamphetamine at issue, the elements of possession, knowledge, and intent to control.

As the State counters, however, when the prosecutor's challenged comments are read in context, rather than in isolation, it becomes clear that the prosecutor did not misstate the controlling law of the case with regard to the possession element. We typically read challenged remarks by a prosecutor in their full context because "reading [such] comments in isolation can frequently be misleading as to the message that the prosecutor was conveying to the jury." *State v. Naputi*, 293 Kan. 55, 59, 260 P.3d 86 (2011).

Here, the context behind the prosecutor's remarks shows that the statements at issue are best characterized as a "legitimate effort by the prosecutor to focus the jury's attention on the evidence it could use to support a conviction." In fact, the entirety of the prosecutor's closing argument demonstrates that the prosecutor was merely attempting to

17

establish Grado's guilt by reminding the jury that the evidence fully supported each of the elements of the charged crimes.

The prosecutor was not claiming that Grado's testimony, standing alone, was sufficient to establish his guilt; instead, the prosecutor was claiming that even under Grado's theory of defense, the evidence proved the possession element of the charged offenses because several of the factors which are indicative of possession in nonexclusive possession cases were present. For instance, the prosecutor reminded the jury of Grado's concession that the hotel room was registered to him, which created a reasonable inference that he had a right to control the area of the room despite the fact that he shared it with two other people. See *Rosa*, 304 Kan. at 435 ("Rosa stipulated that he owned the home and paid the utilities. The other long-term residents did not pay rent. Rosa's status as owner creates an inference of a right to control the areas of the house."). Moreover, the prosecutor pointed out that the contraband was in close proximity to Grado due to the size of the room, the pink case was sitting open on a table, and Grado acknowledged that he used methamphetamine with his uncle. The prosecutor's argument relating to the possession element of the crimes charged was based on appropriate legal factors and the trial evidence.

Having considered the prosecutor's argument in context and in its entirety, we conclude the prosecutor did not misstate the law and, thus, there was no prosecutorial error.

*Referring to Facts Not in Evidence*

Grado also argues that the prosecutor improperly referenced facts not in evidence by indicating that the scales and baggies were in "plain view":

18

"He knew that there was methamphetamine inside of this room because he knew his uncle had some to give to him. *And in addition to that, the scales, the baggies under the same control, the pink case that has the methamphetamine residue, likely—or the residue, rather, that is consistent with the methamphetamine in the bags. It is in plain view. It is in the end side table right next to the bed in a small hotel room.*" (Emphasis added.)

Prosecutors have wide latitude to craft arguments that draw reasonable inferences from the evidence. See *State v. Hart*, 297 Kan. 494, 505-06, 301 P.3d 1279 (2013); *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011). Kansas appellate courts have repeatedly held, however, that a prosecutor may not comment upon facts not in evidence, and when a prosecutor argues facts outside the evidence, the first prong of the prosecutorial error test is met. 292 Kan. at 848; accord *State v. Akins*, 298 Kan. 592, 601, 315 P.3d 868 (2014); *State v. Huerta-Alvarez*, 291 Kan. 247, 263, 243 P.3d 326 (2010).

The statements Grado claims were objectionable do not constitute prosecutorial error. As the State asserts, Grado has misread the prosecutor's statements regarding the location of the various items of contraband within the hotel room because the prosecutor was clearly telling the jury that the pink case, rather than the baggies and scale, was found in plain view. The prosecutor's contention that the pink case was found in plain view is fully supported by the evidence, as Officer Shourbaji testified that it was open and sitting on the table.

In summary, we find that the challenged comments fall within the wide latitude given to prosecutors in discussing evidence. Because the prosecutor did not commit error during closing arguments, it is unnecessary to engage in the second step of the analysis.

SENTENCING DEPARTURE

Prior to sentencing, Grado filed a motion seeking a durational and dispositional departure. Grado asserted the following substantial and compelling reasons justified such

19

a departure: (1) At 20 years of age he was immature at the time the crimes were committed; (2) He "has almost no criminal history, and the only conviction that he does have in his background is unrelated to the current crime[s] of conviction"; (3) He was "acting under the duress and coercion of his uncle Carlos Rodriguez," who was, in actuality, the purchaser and owner of the drugs found in his hotel room; and (4) He had demonstrated an ability and willingness to not repeat these types of behaviors in the future because he had been attending both Alcoholics Anonymous and Narcotics Anonymous meetings, he enrolled in high school courses, and he worked as a trustee while he was incarcerated in Cherokee County.

After considering the parties' arguments, the district court granted Grado's motion for a durational departure, but it denied his request for a dispositional departure because the circumstances surrounding Grado's crimes of conviction demonstrated that he did not appreciate the gravity of his actions because he was "more interested in partying and being with girls."

A sentencing court shall impose the presumptive sentence provided by the Kansas Sentencing Guidelines Act unless the judge finds "substantial and compelling reasons to impose a departure sentence." K.S.A. 2016 Supp. 21-6815(a). But while a district court may depart from the guidelines sentence when substantial and compelling reasons justify a departure, it is not required to do so. See K.S.A. 2016 Supp. 21-6818(a); *State v. White*, No. 113,915, 2016 WL 4063967, at *2-3 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* August 26, 2016; *State v. Williams*, No. 113,803, 2016 WL 3407828, at *3 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* July 18, 2016.

On appeal, Grado contends the district court abused its discretion when it opted not to grant him a dispositional departure or a greater durational departure. This court reviews a district court's decision regarding the extent of a departure sentence for an

20

abuse of discretion. *State v. Spencer*, 291 Kan. 796, 807, 248 P.3d 256 (2011). A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would have taken the view adopted by the court; (2) guided by an erroneous legal conclusion; or (3) based upon an error of fact. *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014). As the party asserting the error, it is Grado's burden to prove such abuse. See *State v. Eddy*, 299 Kan. 29, 33, 321 P.3d 12 (2014).

In particular, Grado claims the district court's decision not to depart further qualifies as an abuse of discretion because the court premised its decision upon an error of fact—Grado had patronized underage prostitutes—a crime for which he was never convicted, and "[b]ecause the district court relied on a fact that wasn't a fact when deciding how to sentence [him]." Grado urges our court to remand this case for resentencing.

The State counters that the district court did not base its decision upon a factual error; instead, the court "considered *everything* before it and noted that while [Grado] was young, the fact that he did not care that what he was doing was illegal outweighed the reformation and rehabilitation possibilities of putting [him] on probation [or departing further]."

In declining to grant Grado's motion for a dispositional departure to probation, the district judge said:

> "And the Court does remember also that part of the evidence that the jury didn't hear because of the motions in limine, that the prostitutes that were in your room, many of those were *underage prostitutes*. So it's the flip side. You didn't appreciate maybe the gravity of what you were doing, but on the other side, you didn't give a damn about what you were doing. You just, you described it yourself. You were more interested in partying and being with girls, and for those reasons, I'm not going to give you probation." (Emphasis added.)

21

The district court's reference to underage prostitutes derived from testimony that Officers Walker and Shourbaji were originally called to the Wesley Inn to investigate a report about possible underage prostitution. But prior to trial, an agreed-upon order in limine was issued which prohibited both sides from mentioning that "there was some speculation by employees at the Wesley Inn that some of the prostitution might have been underage prostitution."

In short, while there was suspicion and speculation about Grado patronizing underage prostitutes, that fact was never admitted or proven.

On this record we are unable to discern whether this error of fact was determinative in the district court's denial of probation and refusal to make a further reduction in Grado's sentences. Given this uncertainty, we vacate Grado's sentences and remand the matter to the district court for resentencing.

Grado's convictions are affirmed, his sentences are vacated, and case is remanded with directions.